### W. J. CARRELL v. THE STATE.

#### No. 3973. Decided March 8, 1916.

**1.—Forgery—Indictment—Written Instrument—Basis of Forgery.**

Where defendant was indicted for forgery of an indorsement on the following check: "Cleburne, Texas, Feb. 23, 1914. The National Bank of Cleburne, County Depository, Please pay to E. M. Wilson or bearer $994.00 Nine hundred and ninety four and no/100 Dollars out of the S. & Co. fund collected for School District No. Transfers for Teaching Incidental expenses. W. J. Carrell, County Superintendent of Public Schools," and one of the exceptions in the motion to quash was that the said instrument was illegal and void and, therefore, could not be the subject of forgery. Held, that under the forgery statutes it could in no event be held that this instrument itself was void so as to prevent it from being the subject of forgery.

**2.—Same—Indictment—Endorsement—Instrument Already in Existence —Pecuniary Obligation**

Where the indictment charged that defendant as county superintendent of public schools drew a certain instrument or check upon the school funds in a certain bank, which was a county depository, in favor of another party or order for $994.00, etc., and that after drawing the same wrote and endorsed the name of the said payee across the back of said instrument, upon which endorsement the alleged forgery was based, then under proper allegations he would still be guilty of forgery even if defendant had no power or authority to draw such check on said depository, etc., as said endorsement would have affected the endorsee pecuniarily and have created a legal pecuniary obligation on his part, and this although the depository had no authority in law to pay such check.

**3.—Same—Indictment—Innuendo—Explanatory Averments—Public Official.**

Where the indictment for forgery alleged that the defendant was the duly and legally elected and qualified county superintendent of public schools, and as such drew said check upon which he afterwards forged the endorsement upon which the forgery was based, and the law designated defendant's official and legal name as county superintendent of public instruction, and it appeared from said check that he had drawn and signed said check as county superintendent of public schools, and that he acted in his official capacity, the said indictment, in the absence of the proper innuendo or explanatory averment

to the effect that in drawing and signing said check as superintendent of public schools it was meant, intended, understood, etc., that he did so as superintendent of public instruction, was fatally defective, as it was by reason of the fact that said check was drawn and signed by defendant in his official capacity on another official that it enabled the payee as holder to defraud another. Following Allison v. State, 45 Texas Crim. Rep., 596, and other cases.

#### 4.—Same—Rule Stated—Indictment—Official Capacity of Defendant.

An indictment or information against a public officer must contain averments as to the official capacity of the defendant, and so characterize him that it may be shown that the offense charged is one denounced by the statute as an offense committed by the defendant as an officer, and not as an offense denounced generally. Following Naill v. State, 59 Texas Crim. Rep., 484, and other cases.

#### 5.—Same—Forgery—Statutes Construed—Pleading—Indictment.

The language of the statute under the subject of forgery is so plain, clear and unequivocal that it needs no construction; all it needs is a true and correct application. See opinion for the discussion of the different articles of the statute on the subject of forgery, and also the different articles on the question of the duty of the county superintendent of public instruction to draw upon and transfer said funds, and that if the alleged forged check or instrument was endorsed by defendant as county superintendent of public instruction and this was averred by proper innuendo or explanatory allegations to the effect that county superintendent of public schools meant in fact county superintendent of public instruction, the indictment would have been sufficient.

Appeal from the District Court of Johnson. Tried below before the Hon. O. L. Lockett.

Appeal from a conviction of forgery; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*D. W. Odell* and *Johnson & Harrell,* for appellant.—On the question of insufficiency of the indictment: Costly v. State, 14 Texas Crim. App., 156; Anderson v. State, 20 id., 595; Kennedy v. State, 33 Texas Crim. Rep., 183; Caffey v. State, 36 id., 198; King v. State, 42 id., 108; Green v. State, 63 Texas Crim. Rep., 510, 140 S. W. Rep., 444; Dreeben v. State, 71 Texas Crim. Rep., 341, 162 S. W. Rep., 501.

*C. C. McDonald,* Assistant Attorney General, for the State.

PRENDERGAST, PRESIDING JUDGE.—Appellant was convicted of forgery, and his punishment fixed at two years and six months confinement in the penitentiary.

In view of the disposition we make of the case on this appeal, we will not discuss nor pass upon the matters of evidence or attack on the charge of the court, as they are neither necessary nor proper to its disposition.

The indictment was in two counts, each alleging a forgery of the same instrument. We will copy such portions of the second count only, which we deem proper or necessary in passing upon its validity.

After the necessary preliminary allegations in an indictment, this

second count avers: That, on or about February 23, 1914, "one W. J. Carrell, who was then and there the duly and legally elected and qualified county superintendent of public schools in and for Johnson County, Texas, without lawful authority, and with intent to defraud, did then and there wilfully and fraudulently alter an instrument in writing then and there already in existence and which had theretofore been made by the said W. J. Carrell, county superintendent of public schools, and which at the time it was so made and before it was altered by the said W. J. Carrell was to the tenor as follows:

Cleburne, Texas, Feb 23 1914.

The National Bank of Cleburne   County Depository

Please pay to E. M. Wilson or bearer $994.00 Nine hundred & ninety four & no/100 Dollars out of the S & Co Fund collected for School District No.   Transfers for Teaching Incidental expenses.

W. J. Carrell
County Superintendent of Public Schools.

And the said W. J. Carrell did then and there alter the said instrument in the manner following, towit: the said W. J. Carrell did then and there write and indorse the name of E. M. Wilson across the back of said instrument so as thereby to make said writing appear as an indorsement of the said instrument by the said E. M. Wilson, and in such manner that the said false indorsement so made would, if the same were true, have created a pecuniary obligation, and have transferred said instrument, and the said instrument after the said alteration by the said W. J. Carrell, as aforesaid, thereby became and then and there was of the tenor following:

Cleburne, Texas February 23, 1914.

The National Bank of Cleburne   County Depository

Please pay to E. M. Wilson or bearer $994.00 Nine hundred & ninety four & no/100 Dollars out of the S & Co. Fund collected for School District No.   Transfers for Teaching Incidental expenses.

W. J. Carrell,
County Superintendent of Public Schools

(Indorsed across the back of it)   E. M. Wilson.

That the following part of said instrument 'out of the S & Co Fund collected for School District No—Transfers for Teaching Incidental Expenses,' meant out of the State and County School Fund apportioned for Johnson County, Texas, for the year A. D. 1914, and that the said sum of $994.00 mentioned in said instrument, was to be paid to the said E. M. Wilson, payee in said check, out of said fund for Transfers."

Then follow averments, to the effect that the bank named meant said bank in Cleburne, Johnson County, Texas, and that said bank had been legally incorporated by virtue of the laws of the United States and was then engaged in the banking business in Cleburne, and that it

had been duly selected depository of the public school funds thereof, and that said bank had accepted said office and duly executed the bond required by law, which bond had been duly accepted and approved, "and which said bank had previous to said date mentioned in said instrument received from the State of Texas the public school funds belonging to the public schools of Johnson·County, Texas, for the year A. D. 1914."

The appellant attacked the validity of this indictment, and each count of it, on every conceivable ground that experienced and able attorneys, it looks like, could think of or imagine. It is wholly unnecessary to specify all of them. They all hinge around, or are bottomed upon, two propositions, in substance:    (1)    That the said instrument was illegal and void, and, therefore, could not be the subject of forgery.    (2)    That there was no such office as that of county superintendent of public *schools* of Johnson County, but that the office was that of superintendent of public *instruction* of said county. It is only these two questions we will discuss and decide, as the decision of these embraces all others.

In discussing the validity of any indictment, the court must necessarily take the allegations as true. Let us first, from the *statute,* see what forgery is, and what instruments are the subject of forgery, and how they can be forged.

Article 925, Penal Code, is: "He is also guilty of forgery who, without lawful authority, and with intent to injure or defraud, shall alter an instrument in writing, then already in existence, by whomsoever made, in such manner that the alteration would (if it had been legally made) have created, increased, diminished, discharged or defeated any pecuniary obligation, or would have transferred, or in any manner have affected any property whatever."

Article 933 specifically says: "It is forgery to make, with intent to defraud, or injure, a written instrument   .   .   .   by writing on the opposite side of a paper so as to make the signature appear as an indorsement."

The indictment herein was based specially on these two articles in connection with the others we now mention.

Article 924, Penal Code, is:   "He is guilty of forgery who, without lawful authority, and with intent to injure or defraud, shall make a false instrument in writing, purporting to be the act of another, in such manner that the false instrument so made would (if the same were true) have created, increased, diminished, discharged or defeated any pecuniary obligation, or would have transferred, or in any manner have affected any property whatever."

Article 926 provides. that the false making or alteration must be done with intent to injure or defraud; "and the injury must be such as affects one *pecuniarily,* or *in relation to his property."*

The next article defines an "instrument in writing," in the broadest and most comprehensive sense which language could do as, "every writing purporting to make known or declare the will or intention of the

party whose act it· purports to be, whether the same be of record or under seal or private signature, *or whatever other form it may have.*"

Article 929, in defining what is meant by the act of *another*, enumerates the United States; this State; every other State or Territory of the United States; all the several branches .of the government of either; all public or private bodies, politic and corporate; all courts; all officers, public or private, in their official capacity; all partnerships iṅ professions or trades; and then concludes: "and all other persons, whether real or fictitious, except the person engaged in the forgery."

The next article says that pecuniary obligation not only means every instrument having money for its object, but every obligation, for the breach of which a civil action for damages may be lawfully brought.

Then the next article, in further definition of what is meant by an instrument which would have transferred or in any manner have affected property, says: "Every species of conveyance, *or undertaking in writing, which supposes a right in the person ,purporting to execute it, to,,* dispose of or change the character of property of every (any) kind, *and which can have such· effect when genuine.*"

It would be. difficult, if not impossible, to find language more comprehensive, and at the same time more specific, to define forgery, than is used in our statute, and, if the law be properly enforced, succeed in punishing the forger, and thus protect the innocent and unsuspecting from his wiles in his attempted, or consummated fraud, or injury, by his forgery. This was the purpose, object and intention of the Legislature in the enactment and repeated re-enactments of said statute. It was well and aptly said by Judge Ramsey, speaking for this court, in Forcy v. State, 60 Texas Crim. Rep., 206: "In these times, as we know, but a small per cent of commercial transactions are carried on and completed in any other form than by note, bond, checks, orders and drafts. While having due regard for the safety of the individual citizen who may be prosecuted for forgery of any of the manifold instruments 'which would in any way affect any pecuniary obligation, or would transfer, or in any manner affect any property whatever,' it is essential that at least some fair regard shall be had to the protection of the great body of our people who are interested in the honesty and integrity of these instruments." The language of the statute is so plain, clear and unequivocal it needs no construction—all it needs, is a true and correct application. It should not, and can not lawfully, be construed away.

In discussing whether or not said instrument (we will herein call it a check) is such as can be forged, we will assume that appellant's official name is averred therein—county superintendent of public instruction; or that proper innuendo or explanatory averments are made to the effect that county superintendent of public instruction was meant, understood, intended, etc., when and where county superintendent of public "schools" instead is used.

It is proper to here state, in a general way, at least, how the available school fund is handled, and the county superintendent's connection therewith and control over it.

The State School Board, on August 1st of each year, apportions the State school fund for the succeeding year to the various counties, based on the scholastic population. The State Superintendent certifies this to the county depositories (treasurers). It is unnecessary to detail how this fund is collected and finally reaches the county depository, except to say that it is paid to it monthly through the Comptroller's, State Superintendent's and State Treasurer's departments, as the taxes are collected. In addition to this fund from the State, the county may get a fund direct from its school lands, or interest on the proceeds thereof, and from other sources also. All of it, however, reaches the county depository during the year, and is held by it to be transferred, or paid out, in maintenance of the county public schools, and all together it is the State and county school fund.

The county superintendent's powers, authority and duties are prescribed by statute. To sum them up generally, they are what the name indicates. He is in truth superintendent of the county public schools. Said schools are taught, managed, controlled, operated, and maintained under his superintendence. Not a dollar of the money in the depository can be paid out, or transferred therefrom, without his action. Every dollar can be paid out, or transferred therefrom, with his proper action. The indictment avers that prior to the time appellant drew said check, the depository had received from the State said school fund belonging to the public schools of said county for 1914, and that the check was drawn in favor of said Wilson and to be paid out of said fund for transfers. Hence, we will state how the fund can be transferred. It will be unnecessary to state how the fund can' be otherwise paid out or withdrawn.

Article 2759, Revised Statutes, authorizes the county superintendent to transfer the whole number of children, when less than twenty, from one district to another in his county; and the next article authorizes him to transfer individual children, without restricting the number, from one district to another in his county. And, by article 2761, he is authorized to transfer children and their proportion of the fund to another county. In articles 2760-2761 he is given express authority to also transfer the child's or children's proportion of the school fund. This authority to also transfer the fund, we think, would necessarily be implied, if not expressly given, in the case provided for in article 2759. It is true article 2759 provides the transfers of children should be made before the apportionment is made, and the next articles provide they shall not be transferred after August 1st, yet, if the children are transferred in time, it does not follow that the fund may not later be transferred; but, on the contrary, we think the fund may not only, but in fact should be, transferred later, if not done at the time the child or children are transferred. It is only in this way that the object, intention and purpose of the law can be carried out, and the fund be properly used for the benefit of the child or children entitled thereto. Again, article 2762 provides for the consolidation of school districts in two or more counties, on the county line, and the transfer of all the

children and their fund from one county to the other in which the principal school building is situated. And this article also further provides, that all children in one district may be transferred to another, upon such terms as the trustees of the respective districts agree upon. In case this is agreed upon by the trustees, the county superintendent would, of course, make the transfer, both of the children and the funds. And yet again: The Thirty-second Legislature by an Act approved March 6, 1911, page 34, passed an Act which was in force in 1914, providing for rural high schools in the county, to be composed of one or more common school districts. The "general management and control" of the schools were vested in five county school trustees therein provided for,—and they were made a body corporate—but they were expressly required to make the county superintendent "their secretary and *executive officer*." The provisions of this Act are somewhat general, but they clearly contemplate and embrace the transfer of both children and their proportion of the school fund, from the common school districts to the rural high school districts. Otherwise, the rural high schools could not have been carried on at all. And, while the county school trustees, as a body corporate, under their general management and control of the schools, probably could, and should, order transfers of children and funds, yet it certainly was not contemplated that they should themselves, individually or collectively, make the specific transfer of the children or their funds, but clearly this would be done upon their order by the county superintendent, their secretary and executive officer. This would comport with the method of the transaction of business by every other corporation. And said Act clearly contemplated that the business of said corporate body of trustees should be executed by their said executive officer as county superintendent, and not otherwise.

Thus we have shown the many ways and contingencies wherein and whereby the county superintendent is authorized and required by law to transfer the school fund of his county from one district to another, and from his county to another county, and he alone can do this. No other person or official can. The depository in this instance was a bank, and it had already collected and had the fund on hand, on deposit. We know, as every other person knows, that the usual, if not practically the exclusive way, to get money on deposit in a bank, out of it, is by check. This is the universal and daily and hourly practice and has always been so. Then everyone would expect, and have no other idea, than that when the county superintendent went to transfer this fund, or any part of it, when it had already been collected and on deposit, he would do so by check, as in this instance, and not otherwise. And doubtless the bank would have required him to have drawn a check, if he had attempted to make the transfer otherwise.

We, therefore, think it clear and certain and hold that the check in this instance under our forgery statute could in no event be held void so as to prevent it from being subject to forgery.

But suppose we are mistaken in holding that the county superin-

tendent could legally have drawn said check under all or some of the contingencies mentioned, and it should be conceded or held, that he had no power or authority to draw it, and that it be conceded or held, as drawn, the depository had no power or authority to pay it, and thereby transfer the fund, then the question would be, are the averments in the indictment sufficient under our statute to charge forgery?

We will discuss the indictment from that standpoint.

It avers that appellant drew said check and as he first drew it, it was thus already in existence, he "did then and there write and indorse the name of E. M. Wilson across the back of it so as thereby to make said writing appear as an indorsement of it by the said Wilson, and in such manner that the said false indorsement so made would, if the same were true, have created a pecuniary obligation and have transferred said check." It also, of course, being averred that appellant did this wilfully and fraudulently and without lawful authority and with intent to defraud.

There can be no question whatever that if Wilson, a real person, had, in fact, indorsed his name on the back of said check and procured the money thereon from the Cresson Bank, that that would have transferred the check to the Cresson Bank. And, if the Cresson Bank had then presented said check to the Cleburne Bank, the depository, and that bank had refused payment because appellant had no authority to draw it, or it had no authority to pay it as drawn, then unquestionably Wilson's indorsement on said check would have affected him pecuniarily and have created a legal pecuniary obligation on his part for the repayment of said amount to said Cresson Bank. And said Cresson Bank, if Wilson had refused or failed to repay said check to it, by reason of his indorsement, could, without doubt, have maintained a suit against Wilson and recovered a judgment against him in a civil action for the amount of the check. All this is so evident and clear and certain, it would be idle to discuss it. The averments in the indictment as drawn, so clearly and fully and distinctly, follow the statute, and are in such strict conformity therewith, no further illustration or application is necessary. The indictment, even on the theory that the check was drawn by appellant without authority of law and contrary to law, and that on the same theory, as drawn, the depository had no authority in law to pay it, and it would have been contrary to law to have paid it, is valid and legal, because the forgery is based entirely on the forgery of Wilson's name by appellant by indorsement on the back of it of his name.

What we decide is no new doctrine, but is in strict accordance with our statute. Neither is it in conflict with any of the well considered cases heretofore decided by this court. We have failed to find any case exactly in point. It is true many of the cases lay down the general proposition, in effect, that when an instrument is void on its face, it is not the subject of forgery. They also lay down the correct proposition, that even though void on its face, it is subject to forgery, if extrinsic facts are alleged showing that the holder might be enabled by

reason thereof to defraud another. In all the cases where this first proposition is laid down and stressed, is where the forgery of the instrument itself solely was under discussion, not a forged indorsement of such an instrument. Our statute makes the indorsement of an instrument forgery under the circumstances therein mentioned, regardless of whether the instrument itself is valid or void. We think it unnecessary to cite or discuss these various cases

This second count of the indictment pointedly avers that appellant was the duly and legally elected and qualified county superintendent of public *schools,* and as such drew said check, etc. That was not his official and legal name, but county superintendent of public *instruction* was. He had drawn and signed the check as county superintendent of public *schools,* and purported to act in his official capacity. There is no innuendo or explanatory averment whatever to the effect that in drawing and signing said check as superintendent of public *schools,* it was meant, intended, understood, etc., that he did so as superintendent of public instruction. It is by reason of the fact that said check was drawn and signed in an official capacity on another official that it enabled the payee as holder to defraud another. Hence, under the authorities, and in reason, it was necessary and essential to make the innuendo or explanatory averments showing that it was meant, intended, understood, etc., to be his official act, and that in using "schools" was meant, etc., instruction, and without this the indictment is fatally defective.

In 17 Enc. of P. & P., p. 240, it is said: "An indictment or information against a public officer must contain averments as to the official capacity of the defendant, and so characterize him that it may be seen that the offense charged is one denounced by statute . . . as an offense committed by the defendant as an officer, and not as an offense denounced generally"; citing in the notes several decisions. See also Allison v. State, 45 Texas Crim. Rep., 596; Naill v. State, 59 Texas Crim. Rep., 484.

On this ground alone will this case be reversed and dismissed.

We think it unnecessary to pass upon the first count. It may be sufficient otherwise than the same fatal defect we have pointed out in the second.

The judgment is reversed and the cause dismissed.

*Reversed and dismissed.*